## BRIGHAM *v.* OVERSTREET.

1. A sugar-cane mill, erected by the owner of a farm thereon, by placing four large lightwood posts firmly in the ground and fastening the mill to them by spikes driven through holes in the mill and into the posts, and a "sugar-cane boiler," which was placed by him in a brick furnace, which was on the ground and the chimney of which ran up through and above the roof of the sugar-mill house, became a part of the realty. The same is true as to an old, partially broken "sugar-cane boiler" which he put down, under a building, in a large horse stable, and from which he ran a gutter to the well on the lot, and used as a watering place for farm stock.

2. When one who erected on his land a storehouse placed therein shelving nailed and fastened to the walls, large and cumbersome counters, tables, and a large meat-box, to carry out the obvious purpose for which the building was erected, to increase its value for such purpose, and to be permanently used in connection with it, they became part of the realty, even though they might have been removed from such house without being injured and without injury to the building.

3. Such fixtures, consequently, passed, as part of the realty, under a conveyance by the owner of the land to a purchaser thereof, when they were not excepted from the operation of the same.

4. A tenant of the land, although he may have placed such fixtures thereon while he was the former owner of the premises, has no right to remove them.

5. Nor has such tenant a right to remove from the premises manure produced in the usual course of husbandry upon the farm during his tenancy, as such manure became appurtenant to the realty and is to be considered and treated as a part of the same.

6. In this State, when the power of a court of equity is invoked to prevent threatened injuries to realty, the old common-law distinction between waste and trespass still exists, and an injunction may issue to prevent the commission of waste, although, if committed, it may not be irreparable in damages and the party threatening to commit it may be solvent; but the rule is otherwise as to mere trespass.

Submitted May 6,—Decided May 21, 1907.

Injunction. Before Judge Rawlings. Screven superior court. January 28, 1907.

E. K. Overstreet brought an equitable action against Charles Brigham and C. F. Rackley. The substance of the petition was as follows: In August, 1905, Brigham sold and conveyed, by warranty deed, certain land to the Southern States Phosphate and Fertilizer Company, which company subsequently rented the land to Brigham for the year 1906. In April, 1906, the company sold the premises to Overstreet and transferred to him the note given it by Brigham for the rent for 1906, possession of the lands being surrendered by the company to Overstreet, subject to the tenancy of Brigham for that year. Before Brigham sold to the fertilizer company, and while he was owner of the premises, he placed thereon a sugar-cane house, sugar-cane boiler, furnace, and sugar-cane mill, the boiler being placed in a brick furnace, which was on the ground and the chimney to which ran up through and above the roof of the sugar-mill house, over the boiler and furnace, the mill being put up by placing four large, substantial, lightwood posts firmly in the ground, and being fastened securely to the posts by spikes driven through holes in the mill and into the posts. All of these were permanent and substantial fixtures, intended to remain on the premises. "Brigham further put down on said place, as a permanent fixture, an old, broken or cracked sugar-cane boiler, same being put down in a large horse stable, under a building, which boiler was used as a watering place for stock, and from which he ran a gutter from the well of the lot on said premises, same being a substantial fixture put there by the said Charles Brigham, the then owner of said premises, with intention that it remain there; [and] while in possession of said property as the owner thereof, said Charles Brigham erected thereon a storehouse, into which a number of shelves, such as are usually built in such buildings, were built, which shelves are attached and nailed to the building, and form part of the building; . . at the same time [he] put in said store several large counters and tables and a very large meat-box; which though not attached and nailed to the floor are very cumbersome and too large to be removed conveniently, and were put there by the said Charles Brigham for the purpose of being allowed to remain there as permanent fixtures." In the deed to the premises from Brigham to the phosphate and fertilizer company none of these fixtures were reserved, and all were passed to petitioner under the sale of the premises to him by such company. There is a quantity

of manure and compost in the stables, sheds, and lots on the premises, made during the year 1906 from straw and manure from the stock. Brigham pretends to have sold all of said fixtures to Rackley, and they are threatening and are, without authority, about to remove the same from the premises, and "the damage to petitioner, should the said Charles Brigham and the said C. F. Rackley . . be allowed to remove said manure and fixtures from said premises, will be irreparable and inestimable." Injunction was prayed against the defendants, restraining them from removing any of such "fixtures" from the premises.

There was no answer by Rackley. Brigham, in his answer, admitted that he had placed on the premises the things which the petitioner denominated "fixtures," but denied that any of them was so attached to the realty as to become a fixture which passed with the sale of the land, and claimed that they were so constructed that they could be easily removed without damage to the realty. He claimed to have sold the shelving, counters, tables, etc., in the storehouse to Mary E. Daniel during 1904, and that she conducted a mercantile business in the store until May, 1905, when she sold the business to Mrs. M. L. Brigham, together with the "store fixtures and furniture referred to in" the petition. He denied that the removal from the premises of any of the things mentioned in the petition would cause "irreparable and inestimable damage to petitioner," but claimed that the money value of them all could be readily and easily computed, and that petitioner had an adequate and complete remedy at law. On the interlocutory hearing, evidence was submitted in behalf of the petitioner, tending to prove all the allegations of the petition, except as to irreparable damages that the petitioner would sustain by the removal from the premises of the articles mentioned in the petition. The court granted an interlocutory injunction, and the defendant Brigham excepted.

*H. S. White,* for plaintiff in error.   *E. K. Overstreet,* contra.

FISH, C. J. (After stating the facts.)

1-4. The court was authorized by the evidence to find that all of the various things involved in this controversy, except the manure, were placed upon the premises, in the manner described in the petition, by Brigham while he was the owner of the premises. Realty or real estate includes all lands and the buildings thereon, and all things permanently attached to either. Civil Code, §3045. Any-

thing intended to remain permanently in its place, though not actually attached to the land (such as a rail fence), is a part of the realty and passes with it. Ib. § 3049. In *Cunningham* v. *Cureton*, 96 *Ga.* 489, it was held, in effect, that whatever is placed in a building to carry out the obvious purpose for which it was erected, or to permanently increase its value for such purpose, and not intended to be moved about from place to place, but to be permanently used with the building, becomes a part of the realty, although it may be removable without injury either to itself or the building; citing *Waycross Opera House Co.* v. *Sossman,* 94 *Ga.* 100. See, in this connection, *Wright* v. *DuBignon,* 114 *Ga.* 765. "As between grantor and grantee the strict rule of the common law prevails, that, in the absence of an agreement to the contrary, all fixtures, whether actually or constructively annexed to the realty, pass by a conveyance of the freehold." *Wolff* v. *Sampson,* 123 *Ga.* 400. A tenant can not remove permanent fixtures, or otherwise injure the rented property. Civil Code, § 3119. In view of the law which we have cited, as applied to the facts as the court was authorized, from the evidence, to find them, we have no difficulty in holding that all the fixtures in question which were on the premises when Brigham sold the land to the Southern States Phosphate and Fertilizer Company passed, under his conveyance of the land to that company, and from such company to Overstreet, and that Brigham, who was the tenant of Overstreet, had no right to remove them from the rented premises.

5. Nor did the tenant have a right to remove the manure. Manure made in the usual course of husbandry upon a farm is so attached to and connected with the realty that, in the absence of an express stipulation to the contrary, it becomes appurtenant to and is treated as part of the realty; it being considered that good husbandry requires that it should be applied to increasing the productiveness of the land whereon it is produced. 19 Am. & Eng. Enc. L. 927; 6 Lawson's Rights, Rem. & Prac. § 2691; Taylor's Landlord & Tenant, § 693. And when so made on rented land, it remains the property of the landlord, even though it be produced by the animals of the tenant from crops owned by him; and while the tenant may use the manure on the farm during his term, he has no right to sell it or to take it away, though this rule applies only in cases of agricultural tenants. 24 Cyc. 1067; Lassell *v.*

Reed, 6 Me. (6 Greenl.) 222; Middlebrook *v.* Corwin, 15 Wend. 169; Bonnell *v.* Allen, 53 Ind. 130.

6. While the tenant had no right to remove the articles in question from the premises, could he be restrained from so doing by injunction, when it was not shown that removal would cause irreparable damages, or that he was insolvent? It should be noted that such removal would not constitute mere trespass, so as to make applicable section 4916 of the Civil Code, which declares: "Equity will not interfere to restrain a trespass, unless the injury is irreparable in damages, or the trespasser is insolvent, or there exist other circumstances which, in the discretion of the court, render the interposition of this writ necessary and proper, among which shall be the avoidance of circuity and multiplicity of actions." The unauthorized removal of the articles by the tenant from the rented premises would be waste; the difference between waste and trespass being that waste is an injury to the estate by one who has not an absolute or unqualified title, but who is rightfully in possession, while trespass is an injury to the estate, or the use thereof, by one who is a stranger to the title. 30 Am. & Eng. Enc. L. 236. Failure to keep in view this distinction has sometimes led to confusion in the adjudication of cases. In Pomeroy's Equity Jurisprudence the learned author, in discussing injunctions to prevent torts, and after saying that "the inadequacy of the legal remedies is the criterion which determines the exercise of this preventive jurisdiction; and the criterion is enforced, especially by the American courts, with great strictness," says: "The legal remedy is ordinarily considered as adequate in cases of torts to the person, and to property held by a legal title, and equity does not interfere. There are, however, certain species of torts, in respect to each of which, as a class, it is settled that the legal remedy is generally inadequate, so that equity will generally interfere to prevent the wrong by injunction. There are other species of torts, in respect to each of which, as a class, the legal remedy is adequate, but may become inadequate, in individual instances, from their particular circumstances, so that in those instances an injunction will be granted. In the kind of torts for which the legal remedy is generally inadequate, so that an injunction is a proper remedy, the title of the injured party must be clear, the injury real, and not merely temporary or transient. They are waste, nuisance," etc.

"In ordinary trespasses the injured party is left to his remedy of damages, but the circumstances of trespass to property—especially to real property—may be such that the compensatory remedy is inadequate, and a court of equity will prevent the wrong by injunction." 4 Pom. Eq. Jur. §1347. Then, as to waste—after defining it and calling attention to "a material distinction between waste and trespass"—he says: "The remedy by injunction is fully established and has not only virtually superseded the old common-law 'action of waste,' but has to a great extent taken the place of the 'action on the case' for damages. An injunction will be granted in all cases where a legal action would lie to recover possession of the land wasted, or to recover damages." Numerous authorities are cited in support of the text. Unquestionably, if the fixtures involved in the present case had been, without the consent of the landlord, removed from the premises by the tenant, an action to recover damages would lie in behalf of the landlord.

Upon the same subject of waste it is said, in Taylor's Landlord and Tenant, §693: "An injunction will issue to restrain a lessee from pulling down, damaging, or destroying, contrary to his covenant, any of the buildings, trees, bark, wood, underwood, hedges, or fences, or from sowing the farm with a pernicious crop, or removing from the farm any of the hay or straw, dung or manure, produced or made thereon, or to prevent a lessee from making such alterations in a dwelling-house, by changing it into a store or warehouse, as would produce permanent injury to the building. But the rule is not so rigid when applied to city leases;" etc. This same author says (§691) : "A landlord need not wait until waste is actually committed; for if he ascertains that the tenant is about to commit an act which would operate as a permanent injury to the estate, the court will restrain him from doing such act. . . Where a tenant from year to year, having received notice to quit, was proceeding to take away the crops, manure, etc., contrary to the usual course of husbandry, and to cut and damage the hedgerows, etc., the chancellor granted an injunction, observing that the principle applied equally to the case of a tenancy from year to year as to a lease for a longer term." The particular case here referred to and cited is Onslow's case, 16 Ves. Jr. 173, decided by Lord Chancellor Eldon in 1809. In George's Creek Co. *v.* Detwold, 1 Md. Ch. Dec. 371, the rule is announced that if

there is a privity of estate between the party applying for the injunction and him who is doing or threatening to do acts injurious to the estate, such as exists between tenant for life or years and the reversioner, it is not necessary that the act should work irreparable injury in order to induce the court to grant the injunction. But if the parties are strangers in respect to the estate, or are claimants adverse to each other, the court will require evidence that the injury threatened will be irreparable, before it will interpose to restrain the acts by injunction. See Atkinson *v.* Chilson, 1 Metc. 398; Poindexter *v.* Henderson, Walk. (Miss.) 176. This is the rule which we think was fairly deducible from the practice of the English courts of chancery in cases involving the grant of injunctions to stay or prevent waste and in cases involving the grant of injunctions to prevent mere trespass.

Upon an examination of our own cases where injunctions have been sought to prevent injuries to realty, it will be seen that as to such cases the old common-law distinction between waste and trespass still exists, and that injunctions have been held to be proper to stay waste, regardless of the question as to whether the damages would be irreparable, while as to cases involving mere trespass it has been otherwise. We shall presently show that so far as this court is concerned it stands committed to the view that an injunction will be granted to stay or prevent waste, whether the damage threatened would be capable of adequate pecuniary compensation or not, and whether the party sought to be enjoined is solvent or insolvent. But, before doing so, it may be well to consider how the distinction as to the use of injunctions in cases of waste and their use in cases of trespass probably arose. At common law there was no preventive process for threatened trespass, however great and irreparable the damage threatened might be. The common law afforded no remedy until the trespass had been committed, when by an action of trespass the owner of the realty might recover damages for the injury which he had sustained. But as to waste it was otherwise. At a very early period, the common-law gave to the owner of the inheritance a remedy against waste by a tenant in dower, or by the courtesy, or a guardian in chivalry, and this remedy was a writ of prohibition, issuing out of chancery, directed to the sheriff and commanding him to prevent the waste from being committed; and in execution of this writ the sheriff

might, if necessary, call to his aid the posse comitatus. Subsequently the scope of this writ was so enlarged as to make it available for the purpose of preventing waste by a tenant for life or for years. In Jefferson v. Bishop of Durham, 1 Bos. & Pull. 120, Lord Chief Justice Eyre said: This writ "was considered as the foundation •of a suit between the party suffering by the waste and the party committing it. If that writ was obeyed, the ends of justice were answered. But if that was not obeyed, and an alias and pluries produced no effect, then came the original writ of attachment out of chancery, returnable in a court of common law, which was considered as the original writ of the court." At common law there was also a writ called the writ of estrepement, the purpose of which was to prevent waste, after judgment obtained in any action real and before possession delivered. Under the statute of Gloucester (6 Edw. I, ch. 13) the scope of this writ was so enlarged as to embrace cases of waste pending suit. 3 Bl. Com. 227, 228. And by statute its scope was also so extended that it was used in connection with actions in which no recovery of land was sought, as in actions of waste, trespass, etc. While, as pointed out by Chancellor Bland in the opinion in Duvall v. Waters, 1 Bland's Ch. (Md.) 569 (18 Am. Dec. 350), in the actions to which the writ of estrepement was applicable, except where it was auxiliary to a writ of waste, the injury which it was the office of the writ to prevent was not, properly speaking, waste, but a trespass in the chancery acceptation of that term, yet such injury was treated and considered as waste. "This writ," said the learned chancellor, "as its very name distinctly imports, is always intended to stay waste. It is nowhere spoken of as a means by which a mere trespass may be prevented; in all its modifications it is continually treated as a remedy against waste: F. N. B. 139, 2 Inst. 328; 3 Black. Com. 225; Jacob's L. Dict. verb. Estrepement." In his very learned and elaborate opinion, wherein he dealt with the subjects of waste and trespass, distinguishing the one from the other, and showing how and when waste could be prevented at common law, while mere trespass could not, he said that "when the court of chancery first granted injunctions, it seems to have taken its jurisdiction from this writ of prohibition of waste." And he took issue with the statement in Mitford's Pleading, that "when the proceeding by ejectment became the

usual mode of trying title to land," instead of the old action real to which the writ of estrepement applied, "as the writ of estrepement did not apply to the case, the courts of equity, proceeding on the same principles, supplied the defect;" and said that the only authorities cited in support of this statement "are cases between landlord and tenant, where the title of the plaintiff had not been, and could not be denied by the defendant, who confessedly held only as tenant." The statement made in Mitford's Pleading is, however, repeated in 2 Story's Equity, § 911, and 1 High on Injunctions, § 649.

But however the jurisdiction of courts of equity to stay or prevent waste may have originated, whether from the writ of prohibition or the writ of estrepement, it is very clear that when they first began to exercise it, and for a long time thereafter, they still recognized and rigidly adhered to the old distinction between waste and trespass, and hence would not enjoin threatened trespass by a mere stranger to the title. In the case of Twort v. Twort, 16 Ves. Jr. 128, decided in 1809, Lord Eldon said: "I have had occasion to express my surprise, that this court did not formerly enjoin in the case of trespass; where there was no intermediate protection; as against waste; and therefore more reason for interfering to prevent irremediable mischief: yet Lord Thurlow long refused an injunction against trespass; and where a mine under one field, demised to the defendant, extended also under another field, belonging to the landlord, but not comprised in the lease, had great difficulty in granting the injunction except as to the former; in which there was privity of estate. It appeared to me that it should have gone to both; and, where the effect was irremediable mischief, I have ventured to do it." Within more recent years, the tendency of courts of equity, both in England and in this country, has been to break down the old distinction between waste and trespass. But this tendency has been toward greater liberality in the use of injunctions to prevent threatened trespass, instead of toward limiting or restricting their use in cases of threatened waste. Now the courts grant injunctions against trespass in all cases where the trespass would produce irreparable damages.

It has been said that the courts have adopted a uniform test, applicable to both classes of cases, making jurisdiction to grant

injunction to depend not upon the relations of the parties, but upon the nature of the injury, the basis of the jurisdiction in both classes of cases being irreparable mischief. See note to Jerome *v.* Ross, 11 Am. Dec. 484, 499; and, to the same effect, see 30 Am. & Eng. Enc. L. 285; High on Injunc. §§655, 673. But upon a careful consideration of the cases decided by this court, we have reached the conclusion that no such uniform test as to the jurisdiction of equity to grant injunctions has been established by it for cases involving trespass and cases involving waste. In cases involving trespass, as we have seen from the section of the Civil Code quoted above, the damages must be in their nature irreparable, or the trespasser must be insolvent, or there must exist other circumstances which, in the discretion of the court, render the grant of the writ necessary and proper, such as the avoidance of circuity and multiplicity of actions. But injunctions to stay or prevent waste have been held to be proper regardless of the question as to whether the damages threatened would be irreparable, and without reference to the solvency or insolvency of the party sought to be enjoined. Thus, in *Smith* v. *Rome,* 19 *Ga.* 89, the court overruled the judgment of the trial judge refusing to grant an injunction, without the slightest allusion to the character of the damages which the plaintiff would sustain if the injunction were not granted, and regardless of the solvency of the municipality, which was not questioned; and placed its decision upon the broad ground that an injunction to stay waste had become almost a matter of course. In reaching its conclusion, the court assumed that the answer of the mayor and city council was true, which answer was, in substance, that "the complainant gave to the defendant the right to open two public streets through his land; that the defendant, in the exercise of this right, opened the two streets; that a 'high rocky bluff' [projected] itself a part of the way across the track of one of the streets; that the defendant took from this bluff, at a point within the boundaries of the street, some rock, and used the rock in macadamizing the streets of Rome and in building culverts; and that the defendant [claimed] the right, thus, to take and use such of the rock as [was] within the boundaries of the street;" and that the damages would not be irreparable. The ruling in *Smith's* case was cited and approved in *Griffin* v. *Sketoe,* 30 *Ga.* 300. In *Markham* v. *Howell,* 33 *Ga.* 508, it appeared that the de-

fendants were in possession of the complainant's land by his consent, and they were enjoined, at his instance, from cutting the timber, though nothing was said as to irreparable damage or insolvency of the defendants, the court holding, "Injunctions in cases of waste are granted as a matter of course;" citing *Smith's* case, supra. In *Brown* v. *Hayes, 33 Ga. Supp,* 136, it was said: "The cutting and carrying off of wood from the land by the complainant amounted to a waste, and in cases of waste injunctions are allowed as a matter of course." The cases of *Smith* and *Markham,* supra, were cited. And it was ruled in *Dickinson* v. *Jones, 36 Ga.* 97, that, "Threatened waste or destruction of timber land, by sawing up the timber or deadening timber land preparatory to opening it for cultivation, or cutting the wood for firewood and sale, by any life-tenant or person claiming through such an one, will be promptly and efficiently restrained by a court of equity upon application by any remainderman." In that case the complainants, who were remaindermen, alleged in their bill for injunction against defendants, who claimed under the life-tenant, that the cutting of the timber by defendants would greatly damage the remainder estate, and that defendants were insolvent. Defendants, in their answers, denied that the remainder estate would be damaged, but alleged that it would be benefited, by the cutting of the timber. One of the two defendants in his answer said nothing as to solvency; the other alleged that he was amply able to respond in damages. On the interlocutory hearing, the evidence as to whether the remainder estate would be damaged by the cutting of the timber was conflicting. There was no evidence as to the solvency or insolvency of either of the defendants. The chancellor refused the injunction, but, as above indicated, this court held that he erred in so doing, and ordered that an injunction be granted. See, in this connection, *Belt* v. *Simpkins,* 113 *Ga.* 894.

Our conclusion is that an injunction was properly granted in the present case. We have, of course, treated the case from the standpoint that the evidence was sufficient to establish the fact that the defendant placed all the fixtures upon the land while he was the owner thereof. There was practically no dispute as to this, except as to the new sugar-cane boiler, which the defendant testified that he placed upon the premises after he became the ten-

ant thereof, but which the plaintiff and another witness testified was placed there while the defendant was the owner of the land. If, upon the final trial, it should appear that the fixtures, or any of them, were placed upon the premises after the defendant ceased to be the owner and became a tenant, other questions might arise, which we do not deem it necessary to now consider. Of course, if the counters, etc., in the storehouse had been, in legal contempla-- tion, severed from the realty, by a separate sale of the same by Brigham to Mrs. Daniel, while he was the owner of the premises, they became her personal property and consequently did not pass under his subsequent sale of the land to the Phosphate and Fer- tilizer Company; and if Mrs. M. L. Brigham purchased them from Mrs. Daniel, the injunction granted in this case against Brigham would not prevent her from removing them. As they are not Charles Brigham's property, he is not hurt by being enjoined from removing them from the premises.

<em>Judgment affirmed. All the Justices concur.</em>