43168.   SHIELD INSURANCE COMPANY v. KEMP et al.

ARGUED NOVEMBER 8, 1967—DECIDED MARCH 14, 1968—
REHEARING DENIED MARCH 29, 1968.

*Kenyon & Gunter, Edgar H. Sims, Jr., E. D. Kenyon,* for appellant.

*Reed & Dunn, Robert J. Reed, Robert E. Andrews,* for appellees.

WHITMAN, Judge. █ The motion to dismiss the appeal is considered to be without merit.

█ The insurance policy became effective in December 1964, and the loss occurred in February 1965. The policy provides that the company "does insure the insured named above [Obie E. Kemp] . . . to the extent of the actual cash value of the property at the time of loss but not exceeding [the cost of repair or replacement] *nor in any event for more than the interest of the insured.* . ." (Emphasis supplied.)

The evidence adduced at the trial showed without dispute

that Kemp had never at any time owned more than a one-half undivided interest in the service station. Kemp's brother owned the other half. Title was taken by Kemp and his brother in January 1962. Six months later the brother conveyed his interest to his father.

Nevertheless, Kemp was entitled under the policy to recover for one-half of the insured loss to the building, if he was otherwise entitled to prevail, and it was not error to refuse to direct a general verdict for the defendant.

■ The appellant also introduced evidence which it claims shows that Kemp had divested himself of his own one-half interest, after which the trial court should have, pursuant to appellant's motions, directed a verdict that Kemp was entitled to recover nothing for the realty and that Kemp's actions had rendered the entire policy void.

This evidence related to an event transpiring before the policy issued. The appellant had admitted into evidence a warranty deed executed by Kemp on July 1, 1964, conveying all his interest in the subject property to his father. Kemp freely admitted that the deed was nothing more than a "dummy" or "bogus" deed which he had drawn up and showed to the sheriff who was about to levy on the property as a result of a judgment obtained against him by a creditor, the North Georgia Petroleum Company. The purpose of the deed was clearly to defraud the judgment creditor. Kemp testified that he did in fact show the deed to the sheriff who then refrained from levying. The evidence was in conflict as to whether the deed was ever delivered by Kemp to his father. Kemp testified that he did not at any time deliver the deed to his father, but placed it back in or on the cash register after he had shown it to the sheriff. The deed was not recorded. The father on the other hand testified that Kemp had handed him the deed and had "deeded me his one-half undivided interest in the station" but that "After he deeded me his interest in the station, he kept on doing business in the station in his name." He also stated that "If Eddie bought tires, batteries, oil or gas or any thing that pertained to the station, he purchased the items in his name. I have signed some of the bills for oil and some other purchases if I was at the station and my son was not there."

The question appellant raises is what effect did Kemp's admittedly fraudulent scheme have on his claim under the policy? Can he, in view of what transpired, claim an insurable interest in the property? The policy provides that: "This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto." This provision can only relate, of course, to concealment or fraud by the insured toward the company. "That one has been guilty of a fraud as to a particular parcel of land in his dealings with one person, so that, as to this person, he is estopped, does not estop him as to another person who is not a privy in estate with the first." *Murray v. Sells*, 53 Ga. 257 (5). See also *Equitable Loan &c. Co. v. Lewman*, 124 Ga. 190 (2) (52 SE 599, 3 LRA (NS) 879). We do not think that Kemp's dealings with others in any way prevent him from claiming an insurable interest if he in fact had an insurable interest when the policy issued and when the loss occurred.

With regard to whether Kemp wilfully concealed or misrepresented the extent of his interest in the property to the company, in which case the policy declares it shall be void, there was no evidence. Therefore, there was no error in refusing to direct a verdict on this ground. See *Farmers Mut. Fire Ins. Co. v. Pollock*, 52 Ga. App. 603 (6) (184 SE 383). This was not a policy declaring the policy absolutely void if the interest of the insured be other than unconditional and sole ownership. For such a case see *National-Ben Franklin Fire Ins. Co. v. Hurley*, 49 Ga. App. 815 (176 SE 780).

The important question, therefore, is did Kemp own a one-half undivided interest in the insured property? This requires a consideration of the deed Kemp executed to defraud his judgment creditor. "The doctrine that the grantor in a deed made for the purpose of hindering, delaying, or defrauding his creditors, or one claiming in his right, can not be heard to question the validity of such deed, does not apply where the deed was not in fact delivered." *Lowry v. Lowry*, 150 Ga. 324 (3) (103 SE

813). "Whether a deed has in fact been delivered is, unless the proof is complete and undisputed, a question for the jury." Id., Hn. 2. The evidence set forth above was conflicting on whether the deed was ever delivered, and the question was properly submitted to the jury.

■ The court is of the opinion that the tank and pumps were a part of the realty. These items were as attached to the land as were the sugar-cane mill and boiler in *Brigham v. Overstreet,* 128 Ga. 447 (57 SE 484, 10 LRA (NS) 452, 11 AC 75). As was stated in that case, anything placed on the land and intended to remain permanently in place, e.g., a rail fence, becomes a part of the realty. Likewise, the machinery of a planing mill was held to be part of the realty. "Although it might have been removed without physical injury to itself or to the building, the machinery was of a kind essential to the completeness of the mill for the purposes for which it was built and was being operated. It could not properly be regarded, therefore, as machinery 'movable at pleasure,' in the sense intended by the Code." *Cunningham v. Cureton,* 96 Ga. 489, 493 (23 SE 420). The case here is the same. The tank and pumps were essential to the completeness of the filling station for the purposes for which it was built and was being operated.

And in *Wofford Oil Co. v. Weems-Fuller Co.,* 166 Ga. 173 (142 SE 887), a filling station case, it was held that *prima facie* the filling station fixtures attached to the realty, and that they do attach in the absence of a contract, by the express or implied terms of which the fixtures are to be considered personalty.

There is nothing in the deed conveying this property to the Kemps that can amount to an agreement that the fixtures are to be considered personalty. That is the contract by which they acquired the station, and under this ruling, the fixtures are a part of the land.

It was error not to so instruct the jury.

What we here hold is in no way conflicting with the ruling in *Trust Co. of Ga. v. Scottish Union &c. Ins. Co.,* 119 Ga. 672 (46 SE 855), that a mortgagee is entitled to all the insurance when the debt of the insured equals or exceeds the amount of the insurance. The insured here was Obie Kemp, and the Gaines-

ville National Bank, as mortgagee, is entitled to have all of the proceeds to which Obie Kemp would otherwise be entitled up to the extent of his debt to the bank. The father, Joe T. Kemp, is not an insured. There is no insurance on his interest in the station under this policy, and the bank can not recover on this policy for any loss of his interest in the property.

■ With regard to appellant's enumerations that the evidence did not support a verdict for the full amount of the policy coverage on the building or the equipment, stock and contents, we have reviewed the entire record. Plaintiff valued the building at $5,000 and at $6,500, basing the latter on replacement cost. The latter must be disregarded since replacement cost is not the basis for arriving at market value. To the $5,000 valuation of the building, the tank and pumps should be added in accordance with our holding above that they were a part of the realty.

Plaintiff listed the tank and pumps on his proof of loss at $3,700, but he testified that this is what they had cost when installed back in 1957, and that they were worth about two-thirds of that at the time of the fire (which would be $2,466.66), and then stated that he thought them to be worth $3,000. The party who sold the tank and pumps testified that he sold them new in October 1957 to a Mr. Abercrombie, who installed them at the station, for $2,274.31, and that they had a life usually of about 10 years. Abercrombie, who purchased them, testified that he paid $2,274.31 for them and installed them at a cost of about $115 (supplies and labor). The invoice representing that sale was admitted in evidence.

Nothing in this evidence could authorize a finding that the pumps and tank had a value of $3,700. The most favorable estimate, from the plaintiff's standpoint, that the jury would have been authorized to accept was $2,398.31.

The evidence, at best, authorized a value to the realty of $5,000 for the building, plus $2,389.31 for the tank and pumps, for a total of $7,389.31. Since plaintiff had but a one-half interest, his loss was $3,694.66.

The only basis for arriving at the value of the contents, even according to the plaintiff's testimony, was to take the inventory of January 2, 1965, and add to it the purchases made from that

date to February 14, 1965, when the fire occurred, and subtract from this total the sales made during that period. Using that as a basis, the plaintiff's bookkeeper testified the value of the contents to be $4,589. The method used appears reliable.

But that figure does not take into account anything that was saved from the fire. Plaintiff testified that a cash register and adding machine were saved. Also it appears that 50 tires were saved undamaged. No values for these items were shown, though the burden was on the plaintiff to do so, since he must show the true amount of his loss. From this evidence, it is not possible to arrive at a value for the contents.

The verdict is obviously excessive, and inasmuch as the court is unable to determine from the evidence the exact amount of such excess, the verdict and judgment must be reversed and a new trial had.

*Judgment reversed. Bell, P. J., and Pannell, J., concur.*

ON MOTION FOR REHEARING.

Appellee insists that his motion to dismiss the appeal on the ground that no transcript of the evidence was filed by the court reporter with the clerk of the court within 30 days after the filing of the notice of appeal should have been granted. The notice of appeal was filed August 11, 1967, and thereafter the transcript was filed with the clerk on September 9, 1967—well within the 30 day requirement. The record does not indicate whether it was filed by the reporter or by someone else, and in that status the presumption is that it was filed by the reporter as the statute provides, for every public officer and indeed every man is presumed to do what the law requires of him. *Vaughn v. Biggers,* 6 Ga. 188 (7); *Marshall v. Russell,* 222 Ga. 490 (1) (150 SE2d 667).

In connection with the motion to dismiss, appellee filed an affidavit of the reporter asserting that he did not personally file the transcript with the clerk, but that on August 6, 1967, he left with one of counsel for the appellant the original and a copy for filing, at counsel's request.

Counsel for appellant, in opposition to the motion to dismiss, filed an affidavit of the reporter in which he asserted that "on Sunday, August 6, 1967, he drove from Toccoa to Gainesville and

personally delivered a copy of said transcript to Mr. E. D. Kenyon, due to the size of the transcript and the unusually high expense of mailing" and during the following week of August 7, 1967, he discussed with appellant's counsel the matter of filing the transcript with the clerk, pointing out that due to mailing expense it would be necessary that he make a trip to Dahlonega to file it, and that counsel then informed him that he expected to be in Toccoa and would be glad to pick up the original and copy and deliver them to the clerk, whereupon he agreed to and did deliver an original and copy to appellant's counsel for filing in his behalf with the clerk.

Although Sec. 10 of the Appellate Practice Act (*Code Ann.* § 6-805 (e)) does provide that "the reporter shall complete the transcript and file the original and one copy thereof with the clerk of the trial court, together with his certificate attesting to the correctness thereof," we can perceive no reason why he cannot deliver the original and copy to the clerk by some designated agent. If he could not, then it could not be done by mail, or by express. It is elementary that one may designate an agent to perform any task for him, or that may be required of him, and accomplishment by or through the agent is as effective as if done by the principal himself, unless the service or thing to be done is so unique in character as to require personal performance by him who undertakes it or is required to do it. There is nothing unique about the matter of physically delivering a transcript of evidence to the clerk of the court.

Moreover, in Sec. 11 of the Act (*Code Ann.* § 6-806) it is provided that "Where there is a transcript of evidence and proceedings to be included in the record on appeal, the *appellant* shall cause the transcript to be prepared and filed as provided in § 10 of this Act," and further that "The *party having the responsibility* of filing the transcript shall cause it to be filed within 30 days after the filing of the notice of appeal." Thus the duty of filing is placed equally on the reporter and the appellant, or cross appellant, as the case may be. This contention is utterly without merit.

Appellee further insists that his motion to dismiss should be sustained because there was no certification of the transcript by

the reporter at the time it was filed with the clerk. In the reporter's affidavit filed by appellant's counsel the reporter asserts that he "inadvertently failed to sign the certificate that the record was true and correct before delivering it to [appellant's counsel] for filing with the Clerk of Lumpkin Superior Court, and upon being so informed deponent later certified said record as required by law and deponent understands that it was *thereafter* delivered by defendant's counsel to the clerk." Thus, at the time of filing with the clerk it was certified by the reporter and there can be no merit in this contention. Nor can it matter that the certificate was dated August 5, 1967, before it was delivered to counsel for filing with the clerk. Even if the transcript had not been certified until after filing with the clerk, it was an amendable defect. *Harper v. Green*, 113 Ga. App. 557 (2) (149 SE2d 163). Appellee made no claim of incorrectness in the transcript before the trial court, nor is there any made in this court. This contention is likewise wholly without merit.

*Motion for rehearing denied.*